IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| CLAUDIA MILENA CAMPOS DUARTE, *et al.*, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. 1:26-cv-63 (RDA/IDD) |
| RAPPAHANNOCK CREATIVE HEALTH CARE, *et al.*, | ) ) ) ) | |
| Defendants. | ) | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

This matter comes before the Court on Defendants Robert Dean, Jeremy Edwards, and Oluwatimilehin Ogunlana's ("Defendants") Motion to Dismiss for Failure to State a Claim (the "Motion"). Dkt. 26. This Court has dispensed with oral argument as it would not aid in the decisional process. *See* Fed. R. Civ. P. 78(b); Local Civil Rule 7(J). This matter is fully briefed and ripe for disposition. Considering the Motion together with the Complaint (Dkt. 1), Defendants' Memorandum in Support (Dkt. 27), Plaintiffs' Memorandum in Opposition (Dkt. 32), and Defendants' Reply (Dkt. 33), the Motion is GRANTED-IN-PART and DENIED-IN PART for the reasons that follow.

## I. BACKGROUND

### A. Factual Background[1]

Plaintiffs Claudia Milena Campos Duarte and Barry David Solarz are the co-administrators of the Estate of Juan Felipe Mejia Campos. Dkt. 1 ¶ 4. Mejia Campos was an 18-year-old man

---

[1] For the purpose of considering the instant Motion to Dismiss, the Court accepts all facts contained within the Complaint as true, as it must at the motion-to-dismiss stage. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

who died on March 28, 2024, at Prince William-Manassas Regional Adult Detention Center ("ADC") as a pretrial detainee. *Id.*

Mejia Campos, who had a documented history of substance abuse involving opioids, specifically fentanyl, was admitted to ADC on or about March 20, 2024 and put on opiate detoxification protocol. *Id.* ¶¶ 11, 12. On March 24, 2024, Mejia Campos was given a urine drug screen confirming he tested positive for fentanyl and marijuana/THC. *Id.* ¶ 12. Between March 20, 2024, and March 28, 2024, medical personnel at ADC were required to monitor Mejia Campos using the Clinical Opiate Withdrawal Scale ("COWS"), a clinically validated tool used to analyze the severity of opiate withdrawal and recommend medical intervention accordingly. *Id.* ¶ 13.

During detention, Mejia Campos's COWS scores were between 5 and 14. *Id.* ¶ 14. A score of 5 to 12 signifies mild withdrawal, and a score of 13 to 24 signals moderate withdrawal requiring increased medical attention. *Id.* In spite of fluctuating scores showing changing levels of distress, Plaintiffs allege that medical personnel did not elevate his care or "recognize the severity" of his deterioration. *Id.* Mejia Campos was prescribed and prison staff administered detoxification medication including Promethazine (25 mg), Benadryl (10 mg), and Clonidine (.7 mg) for seven days, and then subsequently, he received reduced dosages for two more days. *Id.* ¶ 15. Throughout his detention, Mejia Campos exhibited signs of severe medical distress that were observed by multiple officers and medical staff, including: an inability to move or ambulate normally; severe weakness requiring physical assistance; an inability to eat or drink adequately; vomiting and an inability to keep food down; soiling himself; being found naked and unresponsive to questions; dilated pupils; and extremely elevated blood pressure readings. *Id.* ¶ 16.

On March 27, 2024, the day before Mejia Campos died, between 10:00 a.m. and 12:00 p.m., Defendant Nurse Vesha Wright undertook a medical assessment of Mejia Campos. *Id.* ¶ 17.

2

During that assessment, Nurse Wright took notice of a number of symptoms: dilated pupils, which Nurse Wright recognized as a sign of shock or medical emergency; an inability to sit upright without Officer Eric Lindsey physically holding him up; weakness so severe that Mejia Campos could not maintain his position; and an initial blood pressure reading so abnormally high that Nurse Wright believed the equipment had malfunctioned. *Id.* Due to these observations, Nurse Wright determined that Mejia Campos was experiencing a medical emergency and required immediate hospitalization. *Id.* ¶ 18. However, Defendant Nurse Blanca Romero De Tobar ("Nurse Romero") overruled Nurse Wright's clinical concerns that warranted emergency transport, and falsely claimed that a scheduled Jail-Based Medication-Assisted Treatment appointment (during which an inmate can be provide Suboxone) could take the place of emergency care. *Id.* ¶ 19. Plaintiffs allege that such appointments are designed solely for Suboxone treatment management, and not for medical emergencies. *Id.* Specifically, Nurse Romero pointed to a subsequent blood pressure reading of 110/70 to overrule Nurse Wright's clinical observations. *Id.* ¶ 20.

Between 12:00 p.m. and 2:00 p.m., Pablo Alvarado, a Medical Classification Officer, tried to take Mejia Campos to his Jail-Based Medication Assisted Treatment appointment, but he found Mejia Campos in his cell naked and unresponsive to questions, as he could only "mumble incoherently." *Id.* ¶ 21. Alvarado interpreted Mejia Campos's inability to respond as a "refusal of the appointment" and did not enter the cell to assess Mejia Campos's condition. *Id.*

Around 4:20 p.m., Defendant Officer Dean brought Mejia Campos dinner and saw him "naked and in distress." *Id* ¶ 27. Officer Dean knew Mejia Campos was "detoxing badly" and did not "move very much," yet took "no action" to make sure that Mejia Campos received medical attention. *Id.*

Between 9:30 p.m. and 10:30 p.m., Defendant Officer Ogunlana also saw Mejia Campos in "severe medical distress," crawling on his hands and knees to the medication slot in his cell door to get his medication and taking about 10 minutes to swallow a single pill. *Id.* ¶ 22. Plaintiffs allege that Officer Ogunlana saw that Mejia Campos could "barely move or respond," but "despite these obvious signs of a medical emergency," Officer Ogunlana did not call for medical assistance or relay observations to medical staff. *Id.* ¶ 23.

The next morning, starting at 7:00 a.m., Officer Dean was responsible for wellness checks on Mejia Campos. *Id.* ¶ 24. In talking to detectives after the incident, Officer Dean at first claimed he performed a wellness check at 8:12 a.m. and saw Mejia Campos "laying on his bunk facing the top bunk," exhibiting "chest rise" with "slow breathing." *Id.* ¶ 25. However, Officer Dean later admitted he did not perform that check and that Officer Edwards had in fact done the check, claiming that he was "remembering" a check from a different day. *Id.* ¶ 26.

As to Defendant Officer Edwards, at first, he told the detectives that he did not perform the 8:12 a.m. wellness check but later "admitted under pressure" that he had conducted the check. *Id.* ¶ 28. Officer Edwards said he was just "90% sure" that he saw Mejia Campos breathing during the check, and, during that interview, Officer Edwards made "inappropriate comments" to the detectives, including a "joke" about Mejia Campos being naked in his cell. *Id.*

Around 9:00 a.m. on March 28, 2024, First Sergeant John Hitt discovered Mejia Campos unresponsive in his cell, noting that his body was "rigid and cold." *Id.* ¶ 29. Hitt said he had to use force to move Mejia Campos's body and saw that his "color was off," he was in rigor mortis, and he "looked like an 80 year old guy." *Id.* ¶ 29. Nurse Comfort Isaac, the first nurse to respond, also found Mejia Campos in full rigor mortis, with his body "cold and stiff," in a fetal position that could not be straightened, a condition that demonstrated Mejia Campos had died hours before he

4

was found.  *Id.* ¶ 30.  Mejia Campos was pronounced dead at 9:01 a.m.  *Id* ¶ 31.  An autopsy from

Dr. Gene X. Maya from the Office of the Chief Medical Examiner determined that to the cause of

death was "cardiac arrhythmia complicating chronic opioid abuse."  *Id.* ¶ 32.  The manner of death

was ruled natural.  *Id.*  However, the autopsy noted that Mejia Campos was undergoing

detoxification at ADC and suffered a cardiac arrythmia during this process.  *Id.*  Plaintiffs allege

that such arrythmias are often suffered because of dehydration and electrolyte imbalance during

withdrawal.  *Id.*  Plaintiffs allege that "timely medical intervention" "would more likely than not

have prevented the fatal cardiac arrythmia."  *Id.* ¶ 33.

## B. Procedural Background

Plaintiffs filed the Complaint on January 9, 2026.  Dkt. 1.  On February 20, 2026,

Defendants filed their Motion to Dismiss.  Dkt. 26.  On March 5, 2026, Plaintiffs filed their

Opposition. Dkt. 32.  On March 16, 2026, Defendants filed their Reply.  Dkt.  33.

Defendants Wright and Romero, as well as Defendant Rappahannock Creative Health

Care, have answered the Complaint.  Dkts. 34, 37.

## II. LEGAL STANDARD

To survive a 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted

as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662,

678 (2009) (*quoting Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is facially

plausible when "the plaintiff pleads factual content that allows the court to draw the reasonable

inference that the defendant is liable for the misconduct alleged."  *Id.*  "Threadbare recitals of the

elements of a cause of action, supported by mere conclusory statements, do not suffice" to meet

this standard.  *Id.*  When evaluating a motion filed under Rule 12(b)(6), a court "must accept as

true all of the factual allegations contained in the complaint," drawing "all reasonable inferences"

in the plaintiff's favor. *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011) (citations omitted). Generally, courts may not look beyond the four corners of the complaint in evaluating a Rule 12(b)(6) motion, *see Goldfarb v. Mayor & City Council of Baltimore*, 791 F.3d 500, 508 (4th Cir. 2015), but they "may consider documents . . . attached to the motion to dismiss, as long as they are integral to the complaint and authentic[,]" *Sec'y of State for Defence v. Trimble Navigation Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007).

## III. ANALYSIS

In their Complaint, Plaintiffs assert two claims against the moving Defendants: (i) a 42 U.S.C. § 1983 claim asserting a Fourteenth Amendment Violation (Count II); and (ii) a Gross Negligence claim (Count IV). Dkt. 1. The Complaint describes a tragic set of circumstances, which resulted in the unfortunate death of Mejia Campos. The difficult task that the Court faces with respect to this tragedy is in pinpointing whether the allegations in the Complaint are sufficient to plausibly allege a cause of action. The Court addresses each Count in turn.

### A. 42 U.S.C. § 1983 - Fourteenth Amendment Violation

A claim brought on behalf of a pretrial detainee, like Mejia Campos, is premised on the Fourteenth Amendment's Due Process Clause, not the Eighth Amendment's bar on cruel and unusual punishment as for convicted prisoners, because a pretrial detainee may not be "subject to any form of 'punishment.'" *Mays v. Sprinkle*, 992 F.3d 295, 300 (4th Cir. 2021). Under the standard established in *Short v. Hartman*, in order for a defendant to state a claim for deliberate indifference related to a medical need, a pretrial detainee must plead that

> (1) they had a medical condition or injury that posed a substantial risk of serious harm; (2) the defendant intentionally, knowingly, or recklessly acted or failed to act to appropriately address the risk that the condition posed; (3) the defendant knew or should have known (a) that the detainee had that condition and (b) that the defendant's action or inaction posed an unjustifiably high risk of harm; and (4) as a result, the detainee was harmed.

6

87 F.4th 593, 611 (4th Cir. 2023) (citing *Darnell v. Pineiro*, 849 F.3d 17, 35 (2d Cir. 2017); *Gordon v. County of Orange*, 888 F.3d 1118, 1124–25 (9th Cir. 2018); *Miranda v. County of Lake*, 900 F.3d 335, 352–53 (7th Cir. 2018); *Brawner v. Scott County*, 14 F.4th 585, 596–97 (6th Cir. 2021)).

The standard in *Short* came as the result of the Supreme Court's "repudiation" of the dual subjective and objective test in *Kingsley v. Hendrickson*, in which the Supreme Court held that a "pretrial detainee can prevail by providing only objective evidence that the challenged governmental action is not rationally related to a legitimate governmental objective or that it is excessive in relation to that purpose." 576 U.S. 389, 398 (2015); *see also Mays v. Sprinkle*, 992 F.3d 295, 301–02 (4th Cir. 2021) (outlining the objective and subjective test previously applied). The change means that plaintiffs do not need to "show that the defendant had actual knowledge of the detainee's serious medical condition and consciously disregarded the risk that their action or failure to act would result in harm." *Short*, 87 F.4th at 611. Under the new test, for the third element, it is enough for a plaintiff to merely demonstrate that a defendant's actions or inaction were "objectively unreasonable." *Id.* (citing *Kinglsey*, 576 U.S. at 397). In other words, it is sufficient that the plaintiff show that the defendant acted or failed to act "in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known." *Id.* (citing *Farmer v. Brennan*, 511 U.S. 825, 836 (1970)). A medical condition is sufficiently serious for the purposes of the first element of this test when it has "been diagnosed by a physician as mandating treatment" or "is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016) (citing *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008)).

Plaintiffs making claims against non-medical prison official defendants must plead additional elements beyond what is necessary for medical officials. Specifically, plaintiffs must

7

show that a defendant "(1) 'failed promptly to provide an inmate with needed medical care,' (2) 'deliberately interfered with the prison doctors' performance,' or (3) 'tacitly authorized or were indifferent to the prison physicians' constitutional violations.'" *Keeton v. Dudley*, 753 F. Supp. 3d 476, 483 (E.D. Va. 2024) (quoting *Miltier v. Beorn*, 896 F.2d 848, 854 (4th Cir. 1990)). Non-medical officials are "*generally* entitled to rely on the expertise of medical staff," but not when the officials face "liability for *their own decisions*, made while [the decedent] was in their charge." *Rhoads v. Riddell*, 180 F.4th 171, 182 (4th Cir. 2026) (emphasis in original) (citing *Iko*, 535 F.3d at 242). Further, officials ignoring "indications that a prisoner's or pretrial detainee's initial medical treatment was inadequate can be liable for deliberate indifference to medical needs," especially when "[c]ontinued complaints . . . or . . . manifest symptoms . . . would have put defendants on notice that additional care was required." *Id.* at 183 (quoting *Stevens v. Holler*, 68 F.4th 921, 934 (4th Cir. 2023)).

The Court analyzes the allegations as to each officer in turn.[2]

### i. Officer Ogunlana

Plaintiffs allege that Officer Ogunlana was responsible for conducting wellness checks on Mejia Campos and worked the overnight shift in the hours before Mejia Campos died. Dkt. 1 ¶ 10. Plaintiffs allege that he was the last officer to interact with Mejia Campos when he was conscious. *Id.* Between approximately 9:30 p.m. and 10:30 p.m., Officer Ogunlana saw Mejia Campos "crawl on his hands and knees to the medication slot in his cell door to receive his medication" and take about "ten minutes to swallow a single pill." *Id.* ¶ 22. Officer Ogunlana saw that Mejia Campos

---

[2] To adequately plead a Section 1983 violation, plaintiffs must "plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Rice v. Adams*, 172 F.4th 428, 432 (4th Cir. 2026).

could "barely move or respond" yet "failed to call for medical assistance or report his observations to medical staff." *Id.* ¶ 45.

Turning first to the serious medical condition element, no physician diagnosed[3] Mejia Campos as requiring treatment, so therefore, Plaintiffs need to allege facts sufficient to "state a plausible claim for relief" that his condition was "so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Mays*, 992 F.3d. at 300 (quoting *Scinto*, 841 F.3d at 225). The focus of the parties' dispute is over whether Officer Ogunlana's actions were reasonable, given that he is not a medical professional. Defendants argue that Officer Ogunlana "was not going to somehow have a better appreciation for the interpretation of Decedent's symptoms and COWS score than the managing nurse on duty because less than half a day elapsed" and that Plaintiffs have not stated any of the three potential elements for claims against nonmedical defendants under *Keeton.* Dkt. 33 at 2-3. Plaintiffs argue that the "reliance on medical staff defense is not a trump card"—it "gives way when an officer personally observes a detainee in obvious, acute medical distress and still fails to act." Dkt. 32 at 3 (citing *Iko*, 535 F.3d at 242-43).

Here, Plaintiffs have satisfied the first prong of the test for non-medical officials articulated in *Keeton*—in that Defendants "failed promptly to provide an inmate with needed medical care."[4] In the case of Officer Ogunlana, this sort of neglect was more than sufficiently pleaded to clear this bar. Mejia Campos could "barely move or respond," took "ten minutes to swallow a single

---

[3] Although Nurse Wright recognized that Mejia Campos was experiencing a medical emergency and required immediate hospital transport, Nurse Romero overruled Nurse Wright's concerns. Dkt. 1 ¶ 18-19.

[4] In the case underlying the one establishing this test, *Boyce v. Alizaduh*, meeting this bar would require officials being "neglectful of the [Decedent's] needs" by not "promptly provid[ing]" Decedent "with medical attention." 595 F.2d 948, 953 (4th Cir. 1979) (cited in *Miltier v. Beorn*, 896 F.2d 848, 854 (4th Cir. 1990)).

pill," and crawled to the medication slot, yet Officer Ogunlana did nothing in the hours before he died. Dkt. 1 ¶ 22. As indicated *supra*, this is not a case in which Officer Ogunlana or any of the other officers are entitled to rely on the expertise of medical staff—Mejia Campos was under their supervision and they ignored many clear signs of distress.

Plaintiffs have also adequately pleaded the first element required under *Short*—that the detainee "had a medical condition or injury that posed a substantial risk of serious harm." 87 F.4th at 611. Mejia Campos's distress—in struggling to move or respond and crawling—was "so obvious that even a lay person would recognize" the need for medical attention. *Scinto*, 841 F. 3d. at 225. Courts in this District and the Fourth Circuit have routinely found that similar situations are sufficient to establish such a condition obvious to a lay person, including in *Keeton*, in which the pretrial detainee with a history of drug abuse was unable to move and "take care of basic needs such as cleaning or feeding herself." 753 F. Supp. 3d at 483; *see also Riddick v. Watson*, 503 F. Supp. 399, 430 (E.D. Va. 2020) (finding "obvious distress" when detainee told jail officials and medical staff "she used heroin daily and had a history of withdrawal symptoms" and was "physically exhibiting such symptoms to such an extent that it was obvious that she required immediate medical treatment"); *Iko*, 535 F.3d at 241 (finding it "inconceivable" that officers seeing Iko collapse "were not subjectively aware, even as lay persons not trained in medicine, that Iko was in need of medical attention"); *Brown v. Mitchell*, 327 F. Supp. 2d 615, 652 (E.D. Va. 2004) (finding "objectively serious medical condition" in "inability to walk under his own power," along with "sweating, vomiting, [and] incoherence"). Cases in which courts have found this standard not to be satisfied have been when detainees have been "acting normally" without showing "behavioral symptoms" tied to drug use, which is plainly not the case here. *Brown v. Middleton*, 362 F. App'x 340, 344–45 (4th Cir. 2010). Thus, in finding that this element is met,

10

the Court need not rely on Officer Ogunlana's appreciation of the COWS standard at all.  Dkt. 33 at 2-3.  Indeed, Defendant's argument that Officer Ogunlana had no appreciation for that standard or Mejia Campos supports Plaintiff's claim; Officer Ogunlana saw that Mejia Campos was in severe distress and sought no medical assistance from the people who would (or should) have been able to appreciate the severity of his symptoms.

As for the second element under *Short*, it is undisputed that Ogunlana "failed to act" in not taking action to get Mejia Campos medical care.

The Court thus turns to the third element, which is whether a defendant's actions are "objectively unreasonable," or that a defendant acted or failed to act "in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known."  *Short*, 87 F.4th 593 at 611.  Actual knowledge is not required.  *Id.*  For reasons similar to those previously articulated, the record indicates that it is plausible that Officer Ogunlana should have known Mejia Campos was at an "unjustifiably high risk of harm" if he did not take action, given his apparent signs of distress, including difficulties moving normally.  *Id.*; Dkt. 1 ¶ 23.  Here, "no legitimate nonpunitive goal [was] served by a denial or unreasonable delay in providing medical treatment where the need for such treatment is apparent."  *Swink v. S. Health Partners Inc.*, 160 F.4th 438, 451–52 (4th Cir. 2025) (citing *Short*, 87 F.4th at 606).

As for the fourth and final element, that Mejia Campos was harmed as a result of Officer Ogunlana's inaction, courts interpreting this element have required evidence that the officer's actions caused the detainee's injury.  *See Short*, 87 F.4th at 611.  Specifically, in *Rice*, the Fourth Circuit dismissed a complaint because it did not "allow [the court] to connect any named officer to any act or omission that plausibly amounts to deliberate indifference."  172 F.4th at 433.  Other courts have dismissed claims because plaintiffs have not alleged facts explaining how plaintiffs

11

"suffered harm attributable" to the relevant officials. *See Stafford v. PrimeCare Med., Inc.*, 753 F. Supp. 3d 497, 505 (S.D.W. Va. 2024). Generally, the element requires allegations of a "direct causal link." *Smith v. Atkins*, 777 F. Supp. 2d 955, 967 (E.D.N.C. 2011). Here, Plaintiffs acknowledge that causation will likely remain "hotly contested" as the case proceeds but argue that, had Officer Ogunlana "alerted medical staff when he observed the distress the night before Mr. Mejia Campos's death, Mr. Mejia Campos could have been transported to the hospital and his cardiac arrhythmia treated or prevented." Dkt. 32 at 4, 6. Defendants did not directly address causation with respect to Officer Ogunlana but argue that they "should not have known that their actions or inactions would pose an unjustifiably high risk of harm." Dkt. 27 at 7. At this stage, Plaintiffs have plausibly alleged that earlier intervention could have prevented Mejia Campos's death. Therefore, this element is also met, and the Motion to dismiss Count II will be denied as to Officer Ogunlana.

### ii. Officer Dean

Plaintiffs allege that, hours before Mejia Campos died, when Officer Dean served Mejia Campos dinner, he saw Mejia Campos "naked and in distress," knew he was "detoxing badly" and could not "move very much," but took no action to make sure Mejia Campos got medical attention. *Id.* ¶ 27. Officer Dean was also responsible for wellness checks during the "critical hours" when Mejia Campos died and allegedly offered false testimony about performing the "critical" wellness check at 8:12 a.m. *Id.* ¶¶ 8, 24, 25. Plaintiffs have alleged sufficient facts to survive the Motion as to Officer Dean, for the reasons that follow.

As a preliminary matter, Plaintiffs have met the first prong of the test under *Keeton* for non-medical officials—specifically because Officer Dean "failed promptly to provide an inmate with needed medical care." 753 F. Supp. 3d at 483. Plaintiffs allege that Officer Dean knew Mejia

Campos was "detoxing badly" and saw him "naked and distress" and not making much movement but took no action to see that Mejia Campos received medical attention. *See Boyce*, 595 F.2d at 953 (noting that "neglect[t]" is sufficient); Dkt. 1 ¶ 27.  Officer Dean's inaction in the face of actual knowledge of Mejia Campos's significant medical condition and signs of distress when Mejia Campos was under his watch is sufficient to constitute neglect for the purposes of this Motion.

Turning now to the analysis under *Short*, as for the first element, Plaintiffs adequately pleaded that Mejia Campos "had a medical condition or injury that posed a substantial risk of serious harm" for similar reasons as to Officer Ogunlana. 87 F.4th at 611.  Mejia Campos's distress as pleaded—"naked" and "not moving much"—is something that "even a lay person would recognize" as a serious medical condition, especially when coupled with his apparent knowledge that he was detoxing. *See Scinto*, 841 F. 3d. at 225 (discussing the "lay person" standard); *Riddick*, 503 F. Supp. at 430 (finding "obvious distress" in physical withdrawal symptoms); *Iko*, 535 F.3d at 241 (finding a lay person would recognize that a person who collapsed would need medical attention).   Officer Dean's alleged false testimony could also support an inference of "consciousness of guilt," suggesting that he knew Mejia Campos had a serious condition.  Dkt. 1 ¶ 26.

As for the second element under *Short*, it is undisputed that Officer Dean "failed to act" in not taking action to get Mejia Campos medical care.  87 F.4th at 611.

As for the third element, whether Officer Dean's actions are "objectively unreasonable," or that Officer Dean acted or failed to act "in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known," Plaintiffs have also adequately pleaded this prong for similar reasons to Officer Ogunlana.  *Short*, 87 F. 4th 593 at 611.  The need for more

13

care for Mejia Campos, who was "detoxing badly," was "apparent," and there was "no legitimate nonpunitive goal" that would be served by inaction. *Swink*, 160 F. 4th at 451-52. Officer Dean's alleged false testimony about the check that he later recanted further suggests that the need for care was apparent.

Finally, Plaintiffs sufficiently allege the fourth element under *Short*—causation—in plausibly alleging that Mejia Campos died "as a direct and proximate cause" of the "unconstitutional conduct." 87 F.4th 593 at 611; Dkt. 1 ¶ 49. For similar reasons to Officer Ogunlana, Plaintiffs sufficiently "connect" Officer Dean to an omission that plausibly amounts to deliberate indifference—his failure to act when Mejia Campos was under his watch and had obvious signs of medical need. *See Rice*, 172 F. 4th at 433. Defendants argue that "deceitfulness is not equivalent to causation," and that it is "unclear why he is even a named defendant" if he was not doing the checks. Dkt. 33 at 3. However, this overlooks the fact that Plaintiffs allege Officer Dean served Mejia Campos dinner the day before his death and saw him naked and not moving "much" and "in distress," and that Mejia Campos died mere hours later. Dkt. 1 ¶¶ 27, 31. Therefore, the Motion will be denied with respect to Officer Dean.

### iii. Officer Edwards

Plaintiffs allege Officer Edwards originally denied performing the 8:12 a.m. check but later "admitted under pressure" that he had undertaken the check. *Id.* ¶ 28. Officer Edwards said he was just "90% sure that he saw Mr. Mejia Campos breathing" during the check in question, and Plaintiffs allege that Officer Edwards made "inappropriate comments, including a 'joke' about Mejia Campos being naked" in the cell. *Id.* Mejia Campos was found deceased in his cell at 9:00 a.m. and Plaintiffs have affirmatively alleged that "full rigor mortis" had set in and that the

"condition of Mr. Mejia Campos' body demonstrated that death had occurred hours before he was discovered."  Dkt. 1 ¶¶ 29-30.

For similar reasons as discussed for the other officers, Plaintiffs have met the *Keeton* test for non-medical officials—being unsure if Mejia Campos is breathing and not taking action is sufficient to plausibly constitute neglect, especially when coupled with knowledge that he was naked, the jokes about his nakedness, and his alleged "lie[s]" about the check.  *Boyce*, 595 F.2d at 953; Dkt. 1 ¶ 27.

As for the first *Short* element, "a medical condition or injury that posed a substantial risk of serious harm," it should be clear to a "lay person" that when one is unsure if someone is breathing, some sort of action should be taken, especially when that person is naked in a cell, to at least verify that the person is breathing, if not more.  *See Scinto*, 841 F.3d at 225 (discussing the "lay person" standard); Dkt. 1 ¶ 58.  Furthermore, Officer Edwards' alleged lies make it more plausible to that it was clear to a lay person that Mejia Campos was at a substantial risk of serious harm.  Turning to the second, it is again undisputed that Officer Edwards "failed to act" in not taking action to ensure that Mejia Campos received medical care.  As for the third element, whether Officer Edwards's actions are "objectively unreasonable," or that Officer Edwards acted or failed to act "in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known," it is evident that the 10 percent risk that Mejia Campos was not breathing was not one worth taking a chance on, given its potential severity.

Where Plaintiffs' claim fails, however, is the fourth element – causation.  Plaintiffs' affirmative allegations regarding the timing of Officer Edwards' alleged failures and Mejia Campos' death undermine any inference of causation.  Officer Edwards is alleged to have conducted his wellness check at 8:12 a.m., but Plaintiffs allege that, when Mejia Campos was

15

found deceased at 9:00 a.m., he had been dead for "*hours*." *Contrast* Dkt. 1 ¶ 28 (Officer Edwards' check at 8:12 a.m.) *with id.* ¶ 30 (death had occurred hours before 9:00 a.m.). Although it is certainly troubling that Officer Edwards would not have recognized that Mejia Campos was deceased, Plaintiffs' own allegations with respect to the timeline break any inference of causation. *Short*, 87 F. 4th at 611 (requiring allegations that the plaintiff died "as a direct and proximate cause" of the "unconstitutional conduct"). Accordingly, the Motion will be granted with respect to Officer Edwards.

***

In sum, the Motion is denied with respect to the deliberate indifference claims against all Officers Ogunlana and Officer Dean, and Count II will proceed as against them. Count II is dismissed with respect to Officer Edwards.

B. Gross Negligence

Plaintiffs assert a state common law claim of Gross Negligence against Defendants, arguing they had a duty of reasonable care to Mejia Campos that included the duty to "monitor his welfare and to report obvious signs of medical distress to medical personnel." Dkt. 1 ¶ 57. They argue that Defendants' acts and omissions showed a "complete lack of prudence and scant care" that reach the level of gross negligence under Virginia law. *Id.* ¶ 58.

However, Mejia Campos's death from the alleged negligence here bars him from recovering under a theory of gross negligence, because, as Defendants correctly argue, Virginia law establishes that wrongful death is the "exclusive statement of the grievances that Virginia will recognize when a tort victim dies of her injuries." *El-Meswari v. Washington Gas Light Co.*, 785 F.2d 483, 491 (4th Cir. 1986); *see* Dkt. 27 at 9. The Supreme Court of Virginia has held that when "injuries cause death, the recovery must be sought under Code § 8.01-50, the wrongful death

16

statute." *Sosa v. Hill*, 2025 WL 864291, at *8 (E.D. Va. Mar. 19, 2025) (quoting *Lucas v. HCMF Corp.*, 238 Va. 446, 449 (1989)). "Simply stated, if a plaintiff contends that a defendant's negligence caused a decedent's death, and does not assert as an alternative that the negligence caused injury but not death, then only an action for wrongful death can be pursued under Virginia law." *Adams v. NaphCare, Inc.*, 2016 WL 10455885, at *5 (E.D. Va. Dec. 19, 2016), *report and recommendation adopted*, 232 F. Supp. 3d 866 (E.D. Va. 2017). Here, Plaintiffs allege the injuries resulted in Decedent's death.

Plaintiffs attempt to argue that gross negligence can be a predicate to Plaintiff's wrongful death claim for the purposes of this case but misrepresent the cases they cite in doing so. Dkt. 32 at 5. Specifically, Plaintiffs suggest that *Wright v. Eli Lilly* stands for the proposition that their cause of action should be allowed to proceed, as "a decedent's cause of action survives his death, whether or not it is related to the death. If it is related, it becomes a wrongful death claim. If it is not related, it is said to survive." 65 Va. Cir. 485 (2004). However, the *Wright* Court was referring to when "a person who has brought an action for personal injury dies pending the action." *Id.* That is not the case here. Mejia Campos died March 28, 2024, but this suit was not brought until January 9, 2026. Dkt. 1. Plaintiffs also suggest *Green v. Diagnostic Imaging Assocs., P.C.* holds that a gross negligence claim can be brought for someone that allegedly died from tortious activity despite that case stating the opposite expressly—that such a case must proceed under a wrongful death cause of action. 299 Va. 1, 12 (2020); Dkt. 27 at 8. In *Green*, the Supreme Court specifically held, "if the injury complained of caused the death, 'the pleadings are required to be amended, and the case proceeded with as if brought under the death by wrongful act statutes.'" *Green*, 299 Va. at 12 (citing *Seymour v. Richardson*, 194 Va. 709, 712 (1953)). Further, "Code § 8.01-56 plainly

17

states that if the injured individual's death resulted from the injury, the action for that injury must be pursued in a wrongful death suit." *Id.*

Plaintiffs also argue that they bring their gross negligence claim "as both a survival claim and as part of and in support of the wrongful death recovery sought in Count III," so therefore, the "precise point at which Mr. Mejia Campo's condition became unsurvivable is a question for medical experts and the finder of fact:" Dkt. 32 at 6. Count III was brought against different defendants. In support of their argument that Virginia law does not require Plaintiffs "to make an election of which claim to bring," Plaintiffs cite *Centra Health, Inc. v. Mullins*, which held that a lower court did not err in "not requiring the administrators to elect between their personal injury survival claim and wrongful death claim." 277 Va. 59, 78 (2009). The Supreme Court of Virginia in *Centra* also cited its holding in *Lucas* that "there shall be but one recovery for the same injury: if a plaintiff might bring both personal injury and wrongful death actions." *Id.* at 77. In *Lucas,* the Supreme Court of Virginia recognized that plaintiffs are not "constrained to bring only a wrongful death action if causation was in doubt." *Id.* The error, *Lucas* held, was "requiring an election by the plaintiff between the survival claim and a wrongful death claim before the contested causation issue was determined by the trier of fact." *Id.*

Here, the Court does not constrain Plaintiffs options to choose between a survival claim and a wrongful death claim. But Plaintiffs' pleadings do not reflect such that they are walking the fine line between such claims. Plaintiffs do not plead in the alternative that the officers' actions caused an injury other than death. Thus, they constrained their own options in not seeking to "preserve the option to pursue a survival action or wrongful death action" against the relevant Defendants—the officers. *Id.* Accordingly, Count IV will be dismissed.

\*\*\*

Plaintiffs have not yet amended their Complaint, and this is the first time this Court has issued an order on the pleadings in this case. Therefore, the Court cannot say at this stage that Plaintiffs cannot add further allegations to correct the deficiencies identified here. Accordingly, the Court will permit further amendment.

## IV. CONCLUSION

Accordingly, it is hereby ORDERED that Defendants' Motion to Dismiss (Dkt. 26) is GRANTED-IN-PART and DENIED-IN-PART. The Motion is granted as to Count II only with respect to Officer Edwards. The Motion is also granted with respect to Count IV. The Motion is otherwise denied; and it is

FURTHER ORDERED that Count II is DISMISSED WITHOUT PREJUDICE as to Officer Edwards; and it is

FURTHER ORDERED that Count IV is DISMISSED WITHOUT PREJUDICE; and it is

FURTHER ORDERED that Plaintiffs have LEAVE TO AMEND and is DIRECTED to file any Amended Complaint within THIRTY (30) DAYS from the issuance of this Memorandum Opinion. Plaintiffs are warned, however, that if they fail to timely file an Amended Complaint, the Court will assume that they are electing to proceed only as to those Defendants who have answered and as to Officers Ogunlana and Dean on Count II.

It is SO ORDERED.

Alexandria, Virginia
August 13, 2026

/s/
Rossie D. Alston, Jr.
United States District Judge